## SYMONS BROS. & CO. *v.* BRINK.

1. CHATTEL MORTGAGES—RENEWAL—FORECLOSURE—RIGHTS OF CREDITORS.

    Where defendant took possession of a grocery stock under his chattel mortgage, which complainants, general creditors of the mortgagor, sought to have set aside and declared void because defendant failed to file an affidavit of renewal at the expiration of one year, as provided by section 9526, 3 Comp. Laws, 3 Comp. Laws 1915, § 11991, but where the affidavit of renewal was later filed before complainants obtained any mortgage or lien on the mortgaged property, *held*, under the proviso in said statute, that the rights of the parties remained the same as if the affidavit had been filed within the specified period.

2. FRAUDULENT CONVEYANCES — SALES IN BULK — CHATTEL MORTGAGES—FORECLOSURE.

    The primary object of the sales in bulk act (Act No. 223, Pub. Acts 1905, 2 Comp. Laws 1915, § 6346) was to protect creditors against fraudulent sales, and not to preclude foreclosure of a recorded chattel mortgage given in good faith for a valuable consideration.

Appeal from Crawford; Sharpe, J. Submitted October 5, 1916. (Docket No. 43.) Decided December 22, 1916.

Bill by Symons Brothers & Company and others against Rolla W. Brink and Marius Hanson for an injunction, a receiver, and other equitable remedies. From a decree dismissing the bill, complainants appeal. Affirmed.

*Gilbert W. Hand* and *Oscar W. Baker,* for complainants.

*George L. Alexander,* for defendant Hanson.

STEERE, J.  A demurrer to plaintiffs' original bill in this case, sustained in the court below, was formerly overruled on appeal to this court, and the case remanded for further proceedings. 187 Mich. 43 (153 N. W. 359). The ruling of the trial court that the so-called sales in bulk act (Act No. 223, Pub. Acts 1905, 2 Comp. Laws 1915, § 6346), was not violated by the regular foreclosure of a valid chattel mortgage was then sustained; but it did not there appear by the bill, nor was it conceded, that the grievances complained of involved only that question, and the bill, to be taken as true on demurrer, alleged in substance to the contrary. It was therefore found under the then state of the record that various questions sought to be raised were premature, that the bill was not demurrable in its entirety, and the case was accordingly remanded, with permission for defendants to plead over.

Plaintiffs have since then filed two amendments to their bill of complaint, which have been answered by defendant Hanson. Defendant Brink, who was a confessed debtor of both parties beyond his ability to pay, had but a passive interest in the eventuality of this suit, and made no defense. The case was heard in the chancery court of Crawford county upon pleadings and proofs taken in open court, resulting in dismissal of plaintiffs' bill under the court's construction of the law as applied to the facts found.

Plaintiffs are wholesalers located in Bay City and Saginaw, and defendant Hanson is a private banker at Grayling, Mich., where defendant Brink owned and ran a retail grocery store from some time in November, 1910, until about November 11, 1914. On November 22, 1910, Hanson sold Brink a stock of groceries and fixtures on credit, at the appraised price of $2,-134.29, taking a chattel mortgage for that amount as security for the purchase price, in which it was provided that the stock on hand, inventoried at cost,

should at least be maintained at 25 per cent. above "the entire indebtedness hereby secured from time to time existing." It was a long-form, commercial mortgage covering existing and future indebtedness, for which was pledged the property then purchased, and also all merchandise, furniture, fixtures, etc., "which at any time hereafter may be purchased for, or added to, or used in connection with, said stock or business, or commingled with the same." Fifty dollars per month, with interest, was to be paid on the indebtedness, and in case of default in any payments "thereby secured, whether heretofore existing or hereafter contracted," Hanson was empowered to take possession of the mortgaged property, "and to hold the same at said place of business of said party of the first part," or remove it to some other place within the State, "and there retain such property," for such time as he deemed best and convenient, and proceed to sell the same, "either at private sale or public auction, in bulk or parcels." The instrument contained, in regular form and legal phraseology, the usual provision relative to retaining out of the proceeds sufficient to meet the sums owing under the mortgage, expenses, etc., and rendering to the mortgagor the surplus, if any. This mortgage was recorded in the office of the township clerk at Grayling on March 23, 1911, and renewed by proper affidavit, filed October 16, 1912, alleging the amount due on that date to be $2,134.29. A second renewal affidavit was filed by Hanson on November 4, 1914, stating there was then due and owing on said mortgage $2,084.29. Only those two renewal affidavits were filed.

Brink carried a commercial account in Hanson's bank, which he was largely overdrawing at times, and during the same period he was making payments on his mortgage until on October 14, 1912, his checking account was overdrawn $2,350, and credits on his mortgage account had reduced it to $909.29, when, by mu-

tual consent, the credit on his mortgage was transferred to the commercial account to apply on the overdraft, leaving the original amount owing on the mortgage, with the overdraft reduced to below $1,200. On January 2, 1913, a note of Brink for $1,600 was credited to his checking account, which practically balanced his overdrafts, so at that time his indebtedness to Hanson was practically the amount of this note and original amount of the mortgage, with interest. He continued in business unsuccessfully, with increasing indebtedness, until November, 1914, when he was found to be owing Hanson $6,178.42, and other creditors about $2,800, including plaintiff's claims of approximately $2,000 for merchandise sold him between November 1, 1913, and November 4, 1914. He then owned a house and lot in Grayling, valued at $1,000, and 60 acres of wild land, valued at $300. His stock of merchandise was inventoried on November 8th at $3,315.65, and his store accounts, or bills receivable, totaled $3,547.88. He at various times talked over the matter of his indebtedness with Hanson, and states that he generally gave him a list each year of the amounts he was owing, including his indebtedness to plaintiffs, of whom he had bought merchandise to a greater or less extent from the time he went into business in 1910. Early in November, 1914, he told Hanson there was no use of his keeping on in the business; "we were getting in deeper all the time." He states that he then decided to go out of business, and pay his creditors so far as possible with his assets. On November 10, 1915, he voluntarily deeded his house and lot and 60 acres of land to Hanson at an agreed price of $1,300, which was credited upon his $1,600 note, previously reduced to $1,375. He told Hanson that he did not want to go through bankruptcy, owing to the expense of such proceeding, and, after talking the matter over with Hanson, he executed an instru-

ment, on November 14, 1914, by which he assigned to
Mr. Palmer, an attorney of Grayling, all his accounts,
bills receivable, and choses in action, amounting at
face value to $3,547.88, delivering to him all bills,
statements, account books, and evidence of indebted-
ness in relation thereto, authorizing and directing him
as trustee to collect the same and pay the sums col-
lected to Brink's general creditors in proportion to the
amounts due them, and surrendered at about the same
time possession of the mortgaged stock of merchandise
to Hanson, delivering him the keys and inventory of
the property taken November 8, 1914. He stated that
he then thought "the property belonged to Mr. Hanson
by virtue of the mortgage."

At the time of the hearing Palmer testified of the
accounts receivable turned over to him as trustee:

"I have collected $1,004, enough to pay, roughly, 40
per cent. on Brink's accounts.   *  *  *   It is a con-
undrum how much more I can collect on his accounts.
I think I can collect 50 per cent. It is simply guess-
work. I wouldn't guarantee to exceed 50 per cent. of
the whole, although there may be more."

Plaintiffs promptly filed this bill and obtained a pre-
liminary restraining order to preserve the stock of
merchandise *in statu quo,* which, under an arrange-
ment between the parties and stipulation of counsel,
dated November 16, 1914, was set aside without prej-
udice, and Hanson permitted to sell the stock he had
taken possession of at the invoice price to a purchaser
he secured. Plaintiffs ask that Hanson be held a re-
ceiver of the proceeds from the sale of this stock of
merchandise for the benefit of Brink's creditors, be-
cause it was voluntarily sold, transferred, and deliv-
ered to him as an entirety, otherwise than in the ordi-
nary course of trade or usual prosecution of the retail
grocery business, and in violation of the bulk sales
law, and that by reason of the nonrenewal of the chat-

tel mortgage, after October 16, 1912, it became absolutely void under the provisions of section 9526, 3 Comp. Laws, as amended by Act No. 163, Pub. Acts 1915 (3 Comp. Laws 1915, § 11991), as to creditors for accounts created by sale of goods to Brink between November 1, 1913, and November 4, 1914.

This purchase price chattel mortgage was unquestionably good between the parties to it, if never filed. When filed, it ceased to be valid as against creditors of the mortgagor at the expiration of one year, unless renewed by affidavit within the preceding 30 days, under the section referred to, with, however, the important qualifying provision that if an affidavit of renewal is later filed:

"Such affidavit being made and filed before any purchase of such mortgaged property shall be made, or other mortgage received, or lien obtained thereon in good faith, shall be as valid to continue in effect such mortgage as if the same were made and filed within the period as above provided."

Plaintiffs were unsecured general creditors who had acquired no lien on, or distinct property interest in, the mortgaged stock at the time Hanson's belated renewal was filed. They were in the same condition when Hanson took possession of the property, and when they filed their bill of complaint. If the filing of a chattel mortgage is equivalent, as notice, to a change of possession the converse would seem to follow.

"Taking possession after the time for refiling has expired, but before the rights of third parties have attached, protects the mortgagee the same as if he had taken possession, and relied upon that alone in the first place." 2 Cobbey on Chattel Mortgages, § 596.

While the authorities are not always clear, nor at times fully in harmony, upon the exact status of creditors whose claims accrued during continuance of a

default in filing or renewing the mortgage, under statutes declaring the mortgage invalid as to creditors at such a time, the great weight of authority supports the general rule thus stated in Cobbey, § 774:

"To enable a person to attack the validity of a mortgage he must show some right to the property, such as being a subsequent purchaser, lienholder, or a creditor of the mortgagor, who has taken legal steps to subject the property to the payment of his debt. A mortgage cannot be legally questioned until the creditor clothes himself with a judgment and execution, or with some legal process against the property; for creditors cannot interfere with the property of their debtors without process."

Amongst the authorities there cited to sustain this proposition appears *Fearey* v. *Cummings,* 41 Mich. 376 (1 N. W. 946).

To bring out the logic of the rule that an attacking creditor must show some special right in the property, Jones in his work on Chattel Mortgages (5th Ed.), § 245, quotes the following from *American Loan & Trust Co.* v. *Power Co.,* 72 Fed. 620, in reference to delay in attaching an affidavit of good faith to a chattel mortgage:

"At the date of adding to it the affidavit required by the statute, the mortgagor could lawfully have devoted any part of its property to the payment of the mortgagee, in preference to the petitioner, or could have created a valid lien to secure its indebtedness to the mortgagee. Now, if that could have been done by making and executing an entirely new instrument, there is not a single good reason for saying that the mortgage in question could not be made a valid lien on personal property, by adding to it the essential requisites of a chattel mortgage."

In the footnotes to that section the Michigan authorities touching the subject are commented upon, with the final statement:

"But the later cases, as well as some earlier ones, hold that the mortgage can be disputed only by means of some process or proceeding against the property"

—citing several of our decisions, to which may be added *Manwaring* v. *Jenison*, 61 Mich. 117 (27 N. W. 899), and *Wade* v. *Strachan*, 71 Mich. 459 (39 N. W. 582), which quote the statute and support such construction.

We are not unmindful of the difficulties arising in an attempt to harmonize all the decisions of this State on certain phases of the subject, some of which, dealing with the enacting portion of the section, which declares that unrecorded mortgages are absolutely void as to creditors, etc., indicate that relief may be granted in certain cases without any preliminary judgment or lien; but, at least under the wording of the proviso relating to mortgages once duly filed and then renewed before any steps have been taken or lien interposed by others, we think that the weight of our own decisions and the better reason clearly sustain the general rule. Hanson's affidavit of renewal having been filed before plaintiffs obtained any mortgage or lien upon the mortgaged property, the rights of the parties in this case remained the same as if the affidavit of renewal were made and filed within the specified period.

. We cannot agree with complainants' contention that the surrender of this stock of merchandise under the circumstances disclosed amounted to a sale within the common acceptation of that term, or that it operated to transfer the entire title for an agreed consideration in violation of the sales in bulk act. Had Hanson, by reason of his mortgage being void as to creditors, been without any lien upon or special interest in the stock, and Brink transferred the property to him under an agreement that it would be accepted in payment of Brink's indebtedness, the case would be nearer analogous to *Gallus* v. *Elmer*, 193 Mass. 106 (78 N. E. 772,

8 Am. & Eng. Ann. Cas. 1067), upon which plaintiffs
rely. In that case one Kopec had purchased a stock
of goods and appliances from Gallus, largely on credit,
and while in possession, carrying on a butcher and
grocery business, sold most of the merchandise origi-
nally purchased, replenishing his stock with goods
bought from others. When his indebtedness to Gallus
fell due, and payment was demanded, they made a set-
tlement and entered into an agreement in writing,
drawn for the especial purpose of showing Gallus
owned the property, by which Kopec sold and trans-
ferred all his stock of merchandise and articles used in
the business, "with the good will of the same," to Gal-
lus, "his heirs and assigns, forever," who immediately
took over the property, good will and all, in payment
of what Kopec owed him. There Gallus, who had no
mortgage or other lien upon the property which gave
him any priority over other creditors, bought it out-
right for an agreed price, by bargain and sale of the
business and stock in bulk, without complying with
any requirements of the act.

It is true that both Brink and Hanson admit ignor-
ance of the full legal significance of what was done,
and say that they supposed, by Brink's surrender of
possession under the mortgage, Hanson became owner
of the property, but not that it was so agreed. No
writing upon the subject passed between them. Brink
testified that he wanted his creditors to have every-
thing he had; that Hanson took possession by virtue of
the mortgage when he turned the keys over to him,
saying in that connection:

"I also understood that he was to sell that property
and credit the proceeds on my indebtedness. I believed
that would be a credit on my indebtedness, certainly.
I fully realized that the property would not pay the
amount of my indebtedness, and that I would still owe
Mr. Hanson something. There was nothing said, and
no agreement made in any way, shape, or manner,

between us that the transfer of that property was to satisfy and pay the entire indebtedness due him."

Hanson testified in part:

"Why, I took possession of the keys, and I supposed that was all there was to it. * * * I took possession of the stock, and sold it to Mr. De Waele & Son. * * *

"Q. Under and by virtue of what authority did you do those things?

"A. Why, the chattel mortgage on the stock. * * * I took over this property, merchandise, and fixtures of Mr. Brink, by authority of the chattel mortgage, as mortgagee named in the chattel mortgage. I took it over as owner under the chattel mortgage. I supposed I was the owner under the chattel mortgage by virtue of its terms.

"Q. State to the court whether or not that is what you meant when you said you took the property as owner.

"A. Certainly.

"Q. And that was the only sense?

"A. Yes, sir."

Whatever misapprehension he might have been under at that time as to the effect of taking possession, it was the first and proper step towards foreclosing his mortgage, and the only step, beyond possibly negotiating with a prospective purchaser, until he was stopped from proceeding further by a restraining order of the court. If he had a right to proceed with his foreclosure, the stipulation under which he sold the property disposed of any question as to the regularity of subsequent proceedings.

We discover nothing in the testimony which raises a doubt as to the genuineness or amount of Brink's indebtedness to Hanson, nor that reflects on their veracity and good faith in the transaction. No fraud is shown. The case resolves itself into a question of the priority and validity of Hanson's chattel mortgage, under which the property it covered was voluntarily

surrendered, and under which he took possession, and went no further, whatever his ideas might have been, because stopped by an order of the court.

The primary object of the bulk sales act was to protect creditors against fraudulent sales (*Wasserman* v. *McDonnell*, 190 Mass. 326 [76 N. E. 959]), and, as before stated, does not preclude foreclosure of a recorded chattel mortgage given in good faith for a valuable consideration.

The decree is affirmed, with costs.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred. PERSON, J., did not sit.